## CHARLES JOHNSON v. THE STATE.

THEFT.—When property alleged to have been stolen was taken under a claim of ownership, it must appear from the evidence, in order to convict: 1. That the property taken did not belong to the accused; 2. That he did not believe it to be his own when he took it; and 3. That it was fraudulently taken. Each of these facts the jury must be satisfied of beyond a reasonable doubt, and unless they are so instructed a judgment of conviction will not be permitted to stand.

APPEAL from Tarrant. Tried below before the Hon. H. Barksdale.

*George Clark, Attorney General,* for the State.

ROBERTS, CHIEF JUSTICE.—The defendant was convicted of theft of a quirt from a house, and his punishment was assessed at two years' confinement in the penitentiary.

The defendant moved for a new trial on the grounds as follows:

" 1st. The court misdirected the jury as to the law governing the case."

" 2d. The verdict of the jury is contrary to the law and the evidence adduced on the trial."

There is a material variance between the proof and the allegation as to the name of the owner of the quirt and of the house, it being alleged in the indictment to be E. J. Chambers, and proved, according to the statement of facts in the transcript, to be J. D. Chambers.

In addition to this, the facts present a very peculiar, if not extraordinary, case of theft, if it be one. A quirt is taken out of the possession of a negro school teacher, by the witness J. D. Chambers, in the street. Charles Johnson, standing near, claimed the quirt as his property that Chambers had thus seized and taken away from the school-master, and followed him into his office, claiming it, and so open and pressing was his claim of it, that J. D. Cham-

bers left the quirt in his office, and went to the court-house
in search of a warrant or some means of protection, so as
to put a stop to the "insolence" of the defendant, leaving
him sitting on a log in front of his office.   While he was
gone on this errand, Charles Johnson, as we may conclude
from the evidence, resorted to his right of recapture, which
the law gave him, if it really was his quirt, and he could
get possession of it without taking it forcibly away from
any one, as it would seem Chambers had done just before,
or without committing any other breach of the peace.
Johnson entered the office, got the quirt, and as he went
off with it, told one of the witnesses who had overheard
the disputation about it, that he had obtained his quirt.
There is no evidence that he took it away from any one
forcibly, or committed any other breach of the peace in
getting possession of it.   He may have committed a tres-
pass in entering the office of J. D. Chambers without per-
mission; but if it really was his quirt, or if he really be-
lieved it to be his, as he had so openly and urgently in-
sisted, it could be no crime to take it from the house.   He
proved by two witnesses that he owned a quirt, and by one
of them, that he had walked into town that day with his
quirt in his hand.

The two quirts are shown by the evidence to have been
very much alike; but there was one most striking differ-
ence between them which came out on the trial, and
which, if it had been anticipated, could readily have set-
tled the right of property to the particular quirt in contro-
versy, and that difference was that J. D. Chambers' quirt
was an eight-plat quirt, and Charles Johnson's quirt was a
six-plat quirt.   Now, if J. D. Chambers had examined the
quirt which he says he took from the negro schoolmaster,
so as to have stated that it certainly was an eight-plat
quirt, and not a six-plat quirt, then the evidence would
have been much the stronger on his side in establishing
his right of recapture of it from the schoolmaster, who had

possession of it, and that it was really the property of J. D. Chambers, as he evidently believed it to be. Or, on the other hand, if Charles Johnson had brought up his six-plat quirt, and shown by the schoolmaster or otherwise that that was the identical quirt that J. D. Chambers took away from the schoolmaster and that he had recaptured from the house, then the evidence would have been the stronger on his side as to the right of property in the quirt, as he seemed, from the evidence of his open, public, urgent claim, to believe it to be.

In the absence of this satisfactory mode of ascertaining the right of property to the quirt as between the contending parties, the evidence was certainly much stronger in favor of its being the property of J. D. Chambers, because he testified that he took his quirt away from the schoolmaster, who had it in his hand, standing in a crowd of negroes, when defendant claimed it as his. Charles Johnson, being on trial for a felony, could not be sworn to maintain his claim by his oath. Had the issue been upon the right of property to the quirt between the two claimants to it, the verdict might well have been found in favor of Chambers and against Johnson, under the evidence as it was detailed before the jury on the trial, it preponderating in his favor by Chambers' positive testimony that the quirt was his, notwithstanding he had taken it from the peaceable possession of another man, and Johnson at once set up claim to it as his property. But that was not the issue in this case.

The real questions were : Did Johnson take a quirt from the possession and house of Chambers ? Was that quirt the property of Chambers ? Did Johnson fraudulently take the quirt, that is, take it without believing it to be his own property when he took it? And were the jury satisfied of the truth of each one and all of these facts beyond a reasonable doubt from the evidence ?

We do not think that the charge of the court did pre-

sent these issues clearly and distinctly to the jury, but was so shaped as to rather assume that it was Chambers' quirt, and that there was a quirt stolen. It is difficult otherwise to account for the verdict.

For that a freedman, in the open day, in the street, in the city of Fort Worth, in a crowd of people, would claim a quirt as his property from a doctor who had an office there, would follow him into his office and urge his claim of property with such vehemence and earnestness as to be deemed by the doctor "insolence," to a degree that, as a peaceable citizen, he was impelled to go to the court-house in search of a magistrate to get a warrant or some other means of protection, and that all this was done by the freedman upon a pretended claim of right, deceitfully put forth knowingly to deprive the doctor of his property, and not believing that he had any right to it himself, would be a transaction so entirely out of the course of ordinary events in this country as to be very improbable.

If he claimed the quirt, believing it to be his, whether in fact it was or not, and he took it under that claim, he may have been guilty of "insolence," or very bad manners, but not of an offense which consigns to the penitentiary as a felon.

We are of the opinion the motion for new trial should have been sustained, and the judgment will therefore be reversed and the cause remanded.

REVERSED AND REMANDED.